## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LANCE DECHANT and WILLIAM VOGES, derivatively on behalf of LUMINAR TECHNOLOGIES INC., | Case No. |
| Plaintiffs, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| ALEC E. GORES, JUN HONG HENG, MARY LOU JEPSEN, SHAUN MAGUIRE, KATHARINE A. MARTIN, MIKE MCAULIFFE, AUSTIN RUSSELL, MATTHEW J. SIMONCINI, and DANIEL D. TEMPESTA | |
| Defendants, | |
| and | |
| LUMINAR TECHNOLOGIES, INC., | |
| Nominal Defendant. | |

## INTRODUCTION

Plaintiffs Lance Dechant ("Dechant") and William Voges ("Voges," and together with Dechant, "Plaintiffs"), by and through their counsel, derivatively on behalf of Nominal Defendant Luminar Technologies, Inc. ("Luminar" or the "Company"), submits this Verified Stockholder Derivative Complaint against defendants and alleges the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which included, *inter alia*, review and analysis of (i) regulatory filings made by Luminar with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Luminar; (iii) securities class actions against certain officers and members of the Company's Board of Directors (the "Board") alleging the issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading between February 28, 2023 and March 17, 2023 (the "Relevant Period") with respect to Luminar's business, operations, and prospects; and (iv) other publicly available information, including media and analyst reports, concerning Luminar.

## NATURE OF THE ACTION

1.     This is a stockholder derivative action asserted on behalf of Nominal Defendant Luminar against certain officers and the members of the Board for breaches of fiduciary duties and to recover damages caused to the Company because of the misconduct described herein.

2.     The Company is the result of a business combination that closed on December 2, 2020 (the "SPAC Transaction") between a private company, Luminar Technologies, Inc. ("Legacy Luminar"), and Gores Metropoulos, Inc., a special-purpose acquisition company.

3.     Luminar is a global automotive technology company that has focused on "building from the chip level up" the Company's "light detection and raging sensor, or lidar [or "LIDAR"] .

. . to enable next generation safety and autonomous capabilities for passenger and commercial vehicles as well as other adjacent markets."

4.      A LIDAR uses a laser pulse to measure the distance to the target and is purportedly used to generate a 3-D image of the surroundings of a car in real time.

5.      The Company claims to develop photonic integrated circuits ("PICs")—chips that use light waves to transfer and process information—for its semiconductor products.

6.      The development of PICs would help the automotive industry as it will reduce costs and help the economies of scale associated with mass production of LIDAR technology.

7.      On February 28, 2023, the Company hosted its investor day conference, Luminar Day. During Luminar Day, the Company discussed its chip strategy and displayed in its PowerPoint presentation an image of its purported PIC technology. The PIC depicted in the presentation was small, sleek, and simple in design. The Company was in a race to develop sleek, small, and simple PICs because it would help to reduce costs and enable the economics of scale for mass production of LIDAR technologies.

8.      On March 17, 2023, a Forbes article revealed that Luminar had used the image of a PIC that was developed by Lidwave, the Company's main competitor.

9.      On this news, the Company's stock price dropped $0.78 per share, or 9.09% per share over two consecutive trading days to close at $7.80 per share on March 20, 2023.

10.     The Company replaced the image from its presentation materials, which compared to the Lidwave PIC image was far less attractive because it was tiny, black, and white, and did not offer investors the ability to determine whether the image was that of the entire PIC or just an individual part of it.

11.     As a direct and proximate result of the misconduct described herein by the Individual Defendants, Luminar has sustained significant damages as described below.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Sections 10(b) and 21D of the Securities Exchange Act of 1934 ("Exchange Act"). This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     This Court has personal jurisdiction over each defendant because they have the requisite minimum contacts with the forum related to the claims asserted and because exercising jurisdiction over Defendants is fair and reasonable. Nominal Defendant Luminar is incorporated under the laws of the state of Delaware, and the Individual Defendants (defined below) were officers and directors of Luminar at the time that their actions and omissions giving rise to the claims occurred.

14.     Venue is proper in this District under 28 U.S.C. § 1391 and § 1401 because the Company is incorporated in Delaware and is thus a citizen of this District. Additionally, the Company's bylaws contain a forum selection clause requiring stockholder derivative actions like this one to be filed in this District.

## PARTIES

15.     Plaintiff Dechant is a stockholder of Luminar. He was a stockholders at the time of the wrongdoing as alleged herein and has continuously held stock in the Company at all relevant times.

16.     Plaintiff Voges is a stockholder of Luminar. He was a stockholder at the time of the wrongdoing as alleged herein and has continuously held stock in the Company at all relevant times.

17.     Nominal Defendant Luminar is incorporated under the laws of Delaware, and its principal executive offices are located at 2603 Discovery Drive, Suite 100, Orlando, Florida 32826. Luminar's common stock trades on the NASDAQ exchange under the symbol "LAZR."

18.     Defendant Alec E. Gores ("Gores") has served as a member of the Board since December 2020. As of February 28, 2023, Gores owned 5,155,719 shares of Luminar's stock, which were valued at $46 million at the close of trading on the same day. For the Company's fiscal year ended December 31, 2022, Gores received total compensation of $235,427, including $53,000 in earned fees or paid in cash and $182,427 in stock awards.

19.     Defendant Jun Hong Heng ("Heng") has served as a member of the Board since June 2021. He also served as a member of the Audit Committee and the Compensation & Human Capital Management Committee ("Compensation Committee") during the Relevant Period. As of February 28, 2023, Heng owned 2,434,188 shares of Luminar's stock, which were valued at $22 million at the close of trading on the same day. For the Company's fiscal year ended December 31, 2022, Heng received total compensation of $249,594, including $67,427 in earned fees or paid in cash and $182,427 in stock awards.

20.     Defendant Mary Lou Jepsen ("Jepsen") has served as a member of the Board since February 2021. She also serves as Chair of the Nominating & ESG Committee ("Nominating Committee") and as a member of the Compensation Committee. As of February 28, 2023, Jepsen owned 31,784 shares of Luminar's stock, which were valued at $284,467 at the close of trading on the same day. For the Company's fiscal year ended December 31, 2022, Jepsen received total compensation of $249,788, including $67,361 in earned fees or paid in cash and $182,427 in stock awards.

21.     Defendant Shaun Maguire ("Maguire") has served as a member of the Board since June 2021, and was a member of the Nominating Committee during the Relevant Period. As of February 28, 2023, Maguire owned 16,560 shares of Luminar's stock, which were valued at $148,212 at the close of trading on the same day. For the Company's fiscal year ended December 31, 2022, Maguire received total compensation of $243,990, including $61,563 in earned fees or paid in cash and $182,427 in stock awards.

22.     Defendant Katharine A. Martin ("Martin") has served as a member of the Board since February 2021. Martin also served as Chair of the Compensation Committee and as a member of the Nominating Committee during the Relevant Period. As of February 28, 2023, Martin owned 32,675 shares of Luminar stock, which were valued at $292,441 at the close of trading on the same day. For the Company's fiscal year ended December 31, 2022, Martin received total compensation of $257,427, including $75,000 in earned fees or paid in cash and $182,427 in stock awards.

23.     Defendant Mike McAuliffe ("McAuliffe") has served as Chief Executive Officer ("CEO") of the Company's semiconductor subsidiary, Luminar Semiconductors, since October 2022. He is a named defendant in the Securities Class Action.

24.     Defendant Austin Russell ("Russell") is the founder of the Company and has served as President, CEO, and Chair of the Board since December 2020. Russell previously served as the President and CEO of Legacy Luminar and as a member of its board of directors. As of February 28, 2023, Russell owned 1,030,000 shares of Luminar's Class A and 97,088,670 shares of the Company's Class B stock, which were valued at $9.2 million at the close of trading on the same day. For the Company's fiscal year ended December 31, 2022, Russell received total compensation of $93,915,469, including a salary of $1 and $93,915,468 in stock awards.

25.     Defendant Matthew J. Simoncini ("Simoncini") has served as a member of the Board since December 2020. Simoncini also served as Chair of the Audit Committee and a member of the Compensation Committee during the Relevant Period. As of February 28, 2023, Simoncini owned 306,126 shares of Luminar's stock, which were valued at $2.7 million at the close of trading on the same day. For the Company's fiscal year ended December 31, 2022, Simoncini received total compensation of $267,427, including $85,000 in earned fees or paid in cash and $182,427 in stock awards.

26.     Defendant Daniel D. Tempesta ("Tempesta") has served as a member of the Board since August 2022. He also served as a member of the Audit Committee during the Relevant Period. As of February 28, 2023, Tempesta owned 63,320 shares of Luminar's stock, which were valued at $566,714 at the close of trading on the same day. For the Company's fiscal year ended December 31, 2022, Tempesta received total compensation of $522,638, including $22,928 in earned fees or paid in cash and $499,710 in stock awards.

27.     The following defendants are collectively referred to herein as the "Individual Defendants:" Gores, Heng, Jepsen, Maguire, Martin, McAuliffe, Russell, Simoncini, and Tempesta.

28.     The following Individual Defendants are collectively referred to herein as the "Director Defendants:" Gores, Heng, Jepsen, Maguire, Martin, Russell, Simoncini, and Tempesta.

29.     The following Individual Defendants are collectively referred to herein as the "Audit Committee Defendants:" Heng, Simoncini, and Tempesta.

30.     The Individual Defendants and Nominal Defendant are collectively referred to herein as "Defendants."

31.     The following chart identifies the Individual Defendants, their associated references herein, and other relevant information discussed in more detail below:

### THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

32.     At all relevant times, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its stockholders, the members of the public who had invested in Luminar.

33.     Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

34.     The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

35.     Each of the Company's directors owes to the Company and its stockholders the fiduciary duties of care and loyalty, including good faith, oversight, and candor, and must exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

36.     Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

37.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the

Company. By virtue of such duties, the officers, and directors of Luminar were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintains an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

38.     The Individual Defendants knowingly violated their obligations as directors and officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious injury to the Company.

39.     Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Luminar.

40.     In addition, Luminar has adopted a Code of Business Conduct and Ethics (the "Code of Conduct"), which applies to all directors, officers, and employees.

41.     According to the Code of Conduct, its purpose is to:

- promote honest and ethical conduct, including the ethical handling of conflicts of interest;

- promote full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the [SEC] and in other public communications made by the Company;

- promote compliance with applicable governmental laws, rules, and regulations;

- promote the protection of Company assets, including corporate opportunities and confidential information;

- promote fair dealing practices;

- deter wrongdoing; and

- ensure accountability for adherence to the Code.

42.     With regard to the Company's "Core Values," the Code of Conduct states that Luminar "is committed to serving its customers and employing individuals with personal standards consistent with that of the Company's standards of integrity, professionalism, and commitment to superior results. These standards create a foundation of trust and success that is reflected in the Company's relationships with customers, suppliers, stockholders, and one another."

43.     With respect to the Company's disclosures, the Code of Conduct states as follows, in relevant part:

**Honest and Accurate Disclosures**

The Company strives to maintain integrity of the Company's records and public disclosures. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees and others with whom the Company does business.

The Company depends on the books, records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

To help ensure the integrity of the Company's records and public disclosure, the Company requires that:

- no entry be made in the Company's books and records that is intentionally false or misleading;

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records;

- employees comply with the Company's system of internal controls and be held accountable for their entries;

- any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;

- employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents;

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and

- records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

44.     Regarding the use and protection of Luminar's assets, the Code of Conduct states:

**Protection and Proper Use of Company Assets**

All directors, officers and employees should protect the Company's assets and ensure their reasonable and efficient use. Theft, carelessness, and waste have a direct impact on the Company's profitability and are prohibited.

All Company assets should be used only for legitimate business purposes, though incidental personal use is permitted. Employees should have no reasonable expectation of privacy when using Company assets; the Company has the right to inspect the assets at its sole discretion, for any reason. Any suspected incident of fraud or theft should be reported for investigation immediately.

The obligation to protect Company assets includes the Company's proprietary information. Proprietary information includes intellectual property such as trade secrets, patents, trademarks, and copyrights, as well as business and marketing plans, engineering and manufacturing ideas, designs, databases, records and any nonpublic financial data or reports. Unauthorized use or distribution of this information is prohibited and could also be illegal and result in civil or criminal penalties. Refer to the Luminar's Confidential Information and Invention Assignment Agreement that you signed for additional information.

45.     The Code of Conduct also addresses the Company's media contacts and public communications:

**Media Contacts and Public Communications**

It is the Company's policy to disclose material information concerning the Company to the public only in accordance with the Company's Third Party Communications, Media, and Social Media policies in order to avoid inappropriate publicity and to ensure that all such information is communicated in a way that is reasonably designed to provide broad, non-exclusionary distribution of information to the public. Only those individuals designated as official spokespersons in the Company's Third Party Communications, Media, and Social Media policies may address questions regarding financial matters. Please see these policies for additional information.

**The Director Defendants on the Audit Committee Owe Additional Duties**

46.     The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which included Defendants Heng, Simoncini, and Tempesta during the Relevant Period.

11

47.     Pursuant to the Audit Charter, the overarching duties of the Audit Committee and its members include:

> The primary function of the Audit Committee (the "Committee") is to assist the Board of Directors (the "Board") of Luminar Technologies, Inc. (the "Company") in fulfilling its oversight responsibilities with respect to: (i) the integrity of the financial reports and other financial information provided by the Company to its stockholders and others; (ii) the Company's financial policies and procedures and disclosure controls and procedures; (iii) the Company's system of internal control over financial reporting; (iv) the Company's auditing, accounting and financial reporting processes; (v) the qualifications and independence of the Company's independent registered public accounting firm ("independent accountants"); (vi) the performance of the Company's internal audit function (the "Internal Auditor"); and (vii) the Company's financial and operational risk management (unless delegated to a separate committee of the Board). The Committee shall also review and approve related-party transactions (as defined and if required by applicable law, including rules of the Securities and Exchange Commission ("SEC") and the listing standards of The Nasdaq Stock Market LLC ("Nasdaq")). The Committee further aids the Board in its oversight of the Company's tax, legal, regulatory, information security and ethical compliance and the Company's processes and assessments with respect to the Company's management of risk. Moreover, the Committee prepares the report of the Audit Committee that SEC rules require to be included in the Company's annual proxy statement. In carrying out this function, the Committee shall: (i) serve as an independent and objective party to oversee the Company's financial reporting process and internal control system; (ii) review and evaluate the qualifications and independence of the Company's independent accountants; (iii) approve all audit and permissible non-audit services provided by the Company's independent accountants; (iv) review and evaluate the performance of the Company's independent accountants and the Internal Auditor; and (v) facilitate open communication among the independent accountants, financial and senior management, legal counsel, the Internal Auditor, head of ethics and compliance and the Board. The Committee will fulfill its oversight role primarily by carrying out the activities enumerated in the "Responsibilities and Duties" section of this Charter.

> *          *          *

> **Documents/Reports Review**

> 1.  Review with senior financial management and the independent accountants prior to filing the Company's interim financial information, earnings press release and the financial information contained in the Company's quarterly reports on Form 10-Q, including: (i) the selection, application and disclosure of the critical accounting policies and practices used; and (ii) any management certifications related thereto. The Committee Chair may represent the Committee for purposes of this review.

2.  Review the Company's annual financial statements and any other reports or financial information contained in the Company's Annual Reports on Form 10-K, including: (i) the selection, application and disclosure of the critical accounting policies and practices used; (ii) any management certifications related thereto; and (iii) any certification, report, opinion or review rendered by the independent accountants.

3.  Prepare the report of the Committee required by SEC rules to be included in the Company's proxy statement for each annual meeting.

4.  Review any reports submitted by the independent accountants, including a report, if prepared, relating to: (i) all critical accounting policies and practices used; (ii) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent accountants; and (iii) other material written communications between the independent accountants and management, such as any management letter or schedule of unadjusted differences, and discuss with the independent accountants any critical audit matters arising from the current period audit.

5.  At least annually, obtain and review a report by the independent accountants describing: (i) the independent accountants' internal quality control procedures; (ii) any material issues raised by the most recent internal quality control review, or peer review, of the independent accountants, or by any inquiry or investigation by governmental or professional authorities, within the preceding five (5) years, with respect to one or more independent audits carried out by the independent accountants, and any steps taken to address any such issues; and (iii) all relationships between the independent accountants and the Company (to assess the independent accountants' independence). 6. Review and reassess the adequacy of this Charter at least annually, recommend to the Board appropriate changes to the Charter, and assure that the Charter as may be amended is either (i) posted on the Company's website or (ii) included as an appendix to the annual stockholders' meeting proxy statement at least once every three (3) years.

*      *      *

**Legal and Ethical Compliance**

1.  Oversee and review periodically with management, legal counsel, the head of Ethics and Compliance, and other experts, as appropriate, the programs and policies of the Company designed to ensure compliance with applicable laws and regulations, including compliance with financial crimes laws and regulations, the Foreign Corrupt Practices Act, foreign anti-corruption laws, and export control regulations, and with the Company's ethical standards, and the results of these compliance efforts. Review, investigate and recommend to the Board actions the Committee deems appropriate to be taken in connection with any matters pertaining to the integrity of the Company's executive officers (as determined under Rule 16a-

1(f) of the Exchange Act), including conflicts of interest and adherence to standards of business conduct, as required by the policies of the Company.

2.   Oversee the ethics and compliance process as a procedure for receiving, retaining and treating complaints or concerns, including confidential and anonymous submissions received  by the Company regarding accounting, internal accounting controls, auditing or other matters in compliance with applicable law (including SEC rules).

3.   Review periodically with management, legal counsel and other experts, as appropriate, any legal and regulatory matters that may have a material impact on the financial statements.

4.   Coordinate with the Nominating & ESG Committee and the Compensation & Human Capital Management Committee to oversee the Company's ESG reporting requirements and help set up processes to ensure that ESG disclosures comply with applicable laws, regulations and internal control practices.

**Other Responsibilities**

1.   Oversee and review periodically with management the Company's policies relating to finance, capital expenditures, investment, asset management, information management, and the security of its intellectual and physical assets.

2.   Oversee financial-related risks, including risk assessment, major risk exposures and the steps management has taken to monitor and mitigate those exposures, but excluding the enterprise risks over which other Board committees have oversight responsibility.

3.   On behalf of the Board and unless delegated to a separate committee of the Board: (i) periodically receive reports from management to help fulfill the Committee's duties to oversee the principal risk exposures facing the Company and the Company's mitigation efforts in respect of such risks, including the Company's procedures and any related policies concerning risk assessment and risk management; and (ii) review the Company's risk management framework and programs, the Company's adherence to risk limits and its established risk appetite, and the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees, and on an annual basis recommend to the Board the articulation and establishment of the Company's risk appetite.

4.   Oversee the Company's business continuity and disaster preparedness planning.

5.   Review with management other finance, tax, legal and/or administrative issues that the Committee or the Board deems necessary or appropriate.

6.   Make reports and recommendations to the Board on matters within the scope of its functions.

7.  Review and approve all related-party transactions for which audit committee approval is required by applicable law (including SEC and Nasdaq rules).

8.  Retain and consult with independent counsel and other advisors, as it deems necessary or appropriate to carry out its duties, with funding provided by the Company.

9.  Assess the effectiveness of the Audit Committee. In addition to the activities described above, the Committee may perform such other functions as are consistent with its purpose and necessary or appropriate under applicable law, the Company's charter and/or Bylaws, and the resolutions and other directives of the Board.

## SUBSTANTIVE ALLEGATIONS

**Background**

48.   Luminar is a global automotive technology company focuses on building LIDAR technology. The implementation of LIDAR technology in the automotive industry has presented certain issues, primarily, because of the high costs of development and inability to scale. In the race to build cost-effective and scalable components to LIDAR, the Company has purportedly developed PICs, which are chips that use light waves to transfer and process information, for its semiconductor products. PICs would be important to LIDAR technology because they would reduce costs and help the economy of scale associated with mass production of Lidar technology.

**The Individual Defendants Breach Their Duties to the Company and its Stockholders By Issuing False and Misleading Statements**

49.   On February 28, 2023, the Company hosted its investor day conference, Luminar Day, during which Luminar discussed its chip strategy for the development of its LIDAR technologies.

50.   During the conference, the Company falsely represented to investors that the image of the PIC used in the presentation was Luminar's own technology and design. In actuality, the PIC image displayed by Luminar depicted the PIC technology of the Company's competitor, Lidwave.

51.     During Luminar Day, the Company shared the following slide, which portrayed an elegant, sleek, small, simple in design PIC, potentially capable of driving down economies of scale and reducing costs associated with the mass production of LIDAR technologies:



52.     Additionally, the Company displayed the above image in its investor presentation materials posted to Luminar's website and via a live and recorded webcast of Luminar Day posted on YouTube.

53.     During Luminar Day, Defendant McAuliffe referenced the presentation slide and touted the Company's development of its LIDAR and LIDAR-enabling technologies, which included PICs. He also represented that Luminar's PICs could effectively solve many of the major economic and complex issues associated with the mass production of LIDAR and LIDAR-enabling technologies. Particularly, Defendant McAuliffe referenced the slide and stated, in relevant part:

> We only focus on the hardest photon processing problems-generation, detection, and processing. This is what LIDAR is. It's one of the biggest, most difficult physics problems today, with other customers solving similar, very difficult photonic problems. So, we can now take the same platforms, the same products, closely aligned, and leverage that across multiple markets. We solve 1550. There is a general perception that 1550 is an expensive, traditionally an expensive process and it's maybe a drawback. That is not the case. We have solved that problem

through, number one, architecture, as Jason described, number two, advanced packaging, and number three, we can drive the economies of scale and the economics associated with that by leveraging both Luminar volume and volume to the wider market. So, we're shifting gears, we're shifting gears to take what has been a sub-scale industry, sub-scale ecosystem, and industrializing that at scale. And we need to do that. We need to do that both for the economics and for the size, weight, and cost in order to deliver LIDAR at millions of units. And as an example, the other key advantage of siliconization is this: people think that maybe the biggest advantage is you control your own supply chain, that's true, you can control the quality, that's true, you can control the performance, that's true. But the biggest advantage of siliconization, in general, is you can take a lot of complexity and cost out of the product—complexity in cabling, complexity in optics, complexity in electromechanical. So, anything you can put in silicon, you can put in silicon. And I think we can see from other industry leaders, like big fruit companies, that owning that stack and internalizing and siliconizing anything you can delivers elegant architecture, breakthrough performance, and breakthrough economics.

54.     The above statements were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (i) the Company attempted to pass off an image of a competitor's PIC as its own in order to market its products; (ii) such conduct created a significant risk for Luminar of litigation and/or regulatory enforcement actions; (iii) once revealed, the foregoing would detrimentally affect Luminar's business, reputation, and stock price; (iv) the Company failed to maintain internal controls, and (v) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

**The Truth Is Revealed**

55.     On March 17, 2023, *Forbes* published an article titled "Lidar Maker Luminar Accused of Using Image of Rival's Chip in Investor Conference." The *Forbes* article disclosed that the Company "is accused of passing off a next-generation chip design created by a rival as its own technology after showing an image of the processor at a recent investor conference and in

materials on its website." The article also reported that Lidwave "says it plans to take legal action over the matter."

56.     The *Forbes* article stated that the image used during the Luminar Day presentation and webcast on February 28, 2023 looked "identical to a chip on Lidwave's website that is its core technology" and that Lidwave had "sent a cease-and-desist letter to Luminar on March 14 asking it to remove the image." Lidwave also reportedly "notified the [SEC] of Luminar's misuse of its product image to falsely promote its abilities and securities to investors."

57.     In the *Forbes* article, Lidwave CEO Yehuda Vidal is quoted as stating that "[i]ntegrated photonics allows lidar to become as scalable and profitable as anybody has imagined . . . [b]ut surprisingly, the picture Luminar presented of a photonic integrated circuit as their solution is not their solution, but basically the exact image of our lidar." He further stated that "[w]e will continue with a lawsuit if needed because it's a very huge problem for us [because] [s]ome of our customers are very confused about what we do versus what they do."

58.     The *Forbes* article included the picture below of Lidwave's integrated PIC:



Lidwave's integrated photonics chip.  LIDWAVE

59.     The *Forbes* article also included a photo of Defendant McAuliffe beside the slide during the Luminar Day presentation and noted that the complete Luminar Day webcast available

on YouTube had been taken down and removed from Luminar's website. The YouTube presentation had almost 750,000 views at that time.



60.     The *Forbes* article stressed the importance of developing LIDAR, the problems it faces, and the fact that the development of a PIC platform was crucial for its mass adoption. In relevant part, the article stated:

> Lidar's ability to create detailed, 3-D maps of a vehicle's surroundings using lasers has made it a core technology in the race to perfect self-driving cars and trucks. But it's also relatively expensive, with individual units costing thousands of dollars each. Luminar, which has high-volume supply agreements with automakers including Mercedes-Benz, Volvo, Nissan, Polestar, China's SAIC and truck maker Daimler, is poised to be the biggest supplier of the technology by driving down the cost dramatically in the years to come.

> Over the past five years, Orlando-based Luminar, created by optics prodigy (and Forbes 30 Under 30) alum Austin Russell moved from being one of dozens of lidar startups vying to challenge Velodyne, the first company to commercialize the technology for autonomous vehicles, to the de facto industry leader, in terms of the number of vehicles that will be using its sensors. Russell told *Forbes* last month that he intends to have Luminar lidar in "millions of vehicles on the road within a few years."

> Processing vast amounts of data collected by laser sensors requires ever more powerful chips that must also be cheaper and easier to produce. Lidwave's Vidal said that is exactly what his company, formed in 2019 and hoping to begin commercial deliveries in 2024, is working to perfect.

19

"The main problem holding back wide-scale adoption of lidar is its cost resulting from extremely complex microprecision assembly. Today there is no lidar producer that's conclusively solved the economy-of-scale (production) challenge," he said. "A photonic integrated chip platform is basically the Holy Grail for lidar."

61.     The *Forbes* article also stated that the Company replaced the Lidwave's PIC image with the image below:



62.     On this news, the Company's stock price dropped $0.78 per share, or 9.09%, over two consecutive trading days to close at $7.80 per share on March 20, 2023.

**INVESTOR FILES A SECURITIES CLASS ACTION**

63.     On May 26, 2023, a purported purchaser of Company stock filed a securities class action complaint, captioned *Johnson v. Luminar Technologies, Inc.*, Case No. 6:23-cv-00982, in the United States District Court for the Middle District of Florida against Luminar and defendant McAuliffe (the "*Johnson* Complaint"). The *Johnson* Complaint alleges that throughout the class period of February 28, 2023 to March 17, 2023, inclusive, defendants made materially false and/or misleading statements, failing to disclose material adverse facts about the Company's business, operations, and prospects.

### THE INDIVIDUAL DEFENDANTS' MISCONDUCT
### DIRECTLY AND PROXIMATELY CAUSES DAMAGES TO LUMINAR

64.     As a result of the Individual Defendants' misconduct, Luminar disseminated improper public statements concerning Luminar's operations, prospects, and internal controls. This misconduct has devastated Luminar's credibility.

65.     As a direct and proximate result of the Individual Defendants' actions, Luminar has expended and will continue to expend significant sums of money defending and paying any settlement in the Securities Class Action.

66.     As a direct and proximate result of the Individual Defendants' actions as alleged herein, Luminar's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

67.     The actions of the Individual Defendants have irreparably damaged Luminar's corporate image and goodwill. For at least the foreseeable future, Luminar will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Luminar's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### PLAINTIFFS HAVE BEEN STOCKHOLDERS AT ALL RELEVANT
### TIMES AND WILL FAIRLY AND ADEQUATELY REPRESENT
### THE COMPANY'S AND ITS STOCKHOLDERS' INTERESTS

68.     Plaintiffs incorporate by reference and realleges each and every allegation set forth above as though fully set forth herein.

69.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

70.     Plaintiffs are owners of Luminar common stock and were owners of Luminar common stock at all times relevant hereto.

71.     Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

## DEMAND IS FUTILE BECAUSE EACH DIRECTOR DEFENDANT FACES A SUBSTANTIAL LIKELIHOOD OF PERSONAL LIABILITY

72.     At the time Plaintiffs commenced this action, the Board consisted of the eight Director Defendants: Gores, Heng, Jepsen, Maguire, Martin, Russell, Simoncini, and Tempesta. The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

73.     The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's public statements and presentations concerning Luminar's business, operations, prospects, internal controls, and financial statements.

74.     Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

75.     The Director Defendants caused the Company to issue false and misleading statements intended to make Luminar appear more attractive to investors by using an image of a PIC that was not developed by the Company but by its competitor, Ludiwave.

76.     The Director Defendants violated the Code of Conduct because they engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

77.     Each of the Director Defendants has received and continues to receive compensation for their role as a director as described above. As trusted Company directors, they conducted little, if any, oversight over the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For these reasons, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon each of the Director Defendants is futile and, therefore, excused.

78.     The Individual Defendants also violated the Code of Conduct because they failed to act with integrity; avoid conflicts of interest; ensure the Company's disclosures were accurate; ensure the Company complied with applicable laws, rules, and regulations, and promptly report known violations of the Code of Conduct and the law. Thus, because the Director Defendants breached the Company's own Code of Conduct, they are not disinterested and cannot exercise disinterested business judgment in considering a demand\.

79.     The Director Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented

effectively, failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

80.      The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Luminar. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Luminar, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. However, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Luminar to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.

81.      If the Director Defendants were to bring a suit on behalf of Luminar to recover damages sustained because of this misconduct, they would expose themselves to significant liability. For this reason, demand would be futile.

**The Audit Committee Defendants Face
A Greater Likelihood Of Personal Liability**

82.     The Audit Committee Defendants (Heng, Simoncini, and Tempesta), as members of the Audit Committee during the Relevant Period were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosure requirements. Throughout the Relevant Period, however, the Audit Committee Defendants failed to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the adequacy of the Company's internal controls as alleged above and thus, breached their fiduciary duties to the Company. Therefore, the Audit Committee Defendants face a substantial likelihood of personal liability and cannot exercise disinterested business judgment in considering a demand to initiate and prosecute this action.

**Defendant Russell Lacks Independence**

83.     Defendant Russell is not an independent director. Defendant Russell is not independent because he is a co-founder of the Company and currently serves as the President and Chair of the Board, and his principal occupation is as CEO of Luminar. Moreover, Defendant Russell is a controlling stockholder of the Company with a total voting power of 78.2%. Accordingly, Defendant Russell cannot exercise independent business judgment in considering a demand.

**FIRST CAUSE OF ACTION**
**<u>Against the Individual Defendants for Breach of Fiduciary Duties</u>**

84.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

85.     The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligations of good faith, fair dealing, loyalty, and due care.

The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty.

86.    In breach of their fiduciary duties owed to Luminar, the Individual Defendants willfully or recklessly made, caused, or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company attempted to pass off an image of a competitor's PIC as its own in order to market its products; (ii) such conduct created a significant risk for Luminar of litigation and/or regulatory enforcement actions; (iii) once revealed, the foregoing would detrimentally affect Luminar's business, reputation, and stock price; (iv) the Company failed to maintain internal controls; and (v) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

87.    The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby, rendering themselves personally liable to the Company for breaching their fiduciary duties.

88.    Moreover, the Individual Defendants willfully ignored the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

89.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.   Such

material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

90.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

91.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

92.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Luminar has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

93.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Luminar has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

94.     Plaintiffs, on behalf of Luminar, have no adequate remedy at law.

## SECOND CAUSE OF ACTION
### Against the Defendant McAuliffe for
### Contribution Under Sections 10(b) and 21D of the Exchange Act

95.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

96.     Luminar and Defendant McAuliffe are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5. If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant McAuliffe's willful and/or reckless violations of his obligations as an officer of Luminar.

97.     Because of his position of control and authority as an officer of Luminar, Defendant McAuliffe was able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Luminar, including the wrongful acts complained of herein and in the Securities Class Action.

98.     Accordingly, Defendant McAuliffe is liable under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which creates an implied private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

99.     As such, Luminar is entitled to receive all appropriate contribution or indemnification from Defendant McAuliffe.

## THIRD CAUSE OF ACTION
### Against the Individual Defendants for Waste of Corporate Assets

100.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

101.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend legal actions (evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

102.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

103.    Plaintiffs on behalf of Luminar have no adequate remedy at law.

## FOURTH CAUSE OF ACTION
### Against the Individual Defendants for Abuse of Control

104.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

105.    The misconduct of the Individual Defendants constituted an abuse of their ability to control and influence Luminar, for which they are legally responsible.

106.    Each of the Individual Defendants directly abused their control of the Company, in breach of their fiduciary duties of candor, good faith, and loyalty. As a direct and proximate result of the Individual Defendants' misconduct, Luminar has sustained and continues to sustain significant damages.

107.    Plaintiffs on behalf of Luminar have no adequate remedy at law.

## FIFTH CAUSE OF ACTION
### Against All the Individual Defendants for Unjust Enrichment

108.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

109.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Luminar.  The Individual Defendants were

unjustly enriched by their receipt of compensation while breaching fiduciary duties owed to Luminar.

110.    Plaintiffs, as stockholders and representatives of the Company, seek restitution from the Individual Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

111.    Plaintiffs on behalf of Luminar have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Declaring that Plaintiffs may maintain this derivative action on behalf of Luminar and that Plaintiffs are proper and adequate representatives of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.    Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: November 16, 2023

                                              /s/ P. Bradford deLeeuw
                                              P. Bradford deLeeuw (DE Bar # 3569)
                                              deLeeuw Law LLC
OF COUNSEL:                                    1301 Walnut Green Road
                                              Wilmington, Delaware 19807
Brandon Walker                                Telephone: (302) 274-2180
Melissa A. Fortunato                          Facsimile: (302) 351-6905
BRAGAR EAGEL & SQUIRE, P.C.                    brad@deleeuwlaw.com
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone: (212) 308-5858
Facsimile: (212) 214-0506
walker@bespc.com
fortunato@bespc.com